IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────

TERRANCE J. SHAW,

                Plaintiff,            OPINION & ORDER

   v.

                                          13-cv-847-wmc

KIMBERLY METZEN,

                Defendant.

───────────────────────────────────────────────

      In this *pro se* prisoner litigation brought under 42 U.S.C. § 1983, plaintiff Terrance J. Shaw alleges that defendant Kimberly Metzen, a former library assistant at Oshkosh Correctional Institution ("OSCI"), retaliated against him for exercising his First Amendment rights by "filing prior complaints against her for harassment and misinterpreting the rules and policies," as well as for "not doing her job." (Compl. (dkt. #2) ¶ 31.) Metzen now moves for summary judgment (dkt. #29). For the reasons discussed below, the court agrees that Shaw has failed to establish a prima facie case on this record, and so it will grant Metzen's motion in its entirety.

UNDISPUTED FACTS[1]

**I.    Parties**

      Plaintiff Terrance Shaw is a Wisconsin state prisoner confined at OSCI. Defendant Kimberly Metzen was employed by the Department of Corrections ("DOC") as a Library

───────────────────────────────────────────────

[1] Shaw filed two separate motions for an extension of time to prepare his reply in support of his proposed findings of fact. (Dkt. ##46, 51.) Those motions will be granted. The court has considered his reply (dkt. #52) in determining the facts below, which it finds to be undisputed unless otherwise noted.

Services Assistant at OSCI from February of 2002 until July of 2013. In that role, Metzen worked with Cassandra Chaney, the OSCI Librarian.

## II. General Library Policies

The law library operates in conjunction with the general library and is open the same hours. General population inmates who have completed orientation may use the law library at any time during posted hours by arriving on time at the B-Building where it is located and signing into the law library's sign-in book. Inmates are to sign out from the center anytime they leave the center where they are generally housed, but they are required to sign out when *actually* leaving, not ahead of time. As a general rule, inmates are to leave their center no earlier than ten minutes before the scheduled starting time of the assignment or program activity at another building, unless otherwise specified in the center handbook. (Def.'s Reply DPFOF (dkt. #42) ¶ 10.) Shaw understood that inmates housed in W-Building, as he was during the relevant time, were permitted to sign out *fifteen* minutes ahead of time because of the distance between W-Building and the library. (Pl.'s Add'l PFOF (dkt. #40) ¶ 2.) As support, he provided a page from the W-Building handbook dated April 9, 2003. (Decl. of Sheri Fromolz Ex. 109 (dkt. #33-7), at 8.) It is also undisputed that on or about January 3, 2011, Metzen assumed Shaw had signed out of W-Building too early, but that she later apologized and permitted Shaw to stay for the scheduled library period after checking W-Building's housing rules. (Def.'s Resp. Pl.'s Add'l PFOF (dkt. #43) ¶ 16.)

Further muddying the record, however, is a subsequent library memo, dated August 23, 2011, which actually supports Metzen's original understanding of the rules. It reads in

2

relevant part that "[i]nmates may sign-out to go to the library 10 minutes before the start of the posted time for that unit" and "[i]nmates may not arrive in the B Bld. for the library outside the 10 minute movement time or they will be sent back to their unit and lose their library privileges for the day." (Decl. of Kimberly Metzen Ex. 102 (dkt. #32-2).)

Regardless of whether the ten-minute or fifteen-minute sign out time for departures from the W-Building applies, the parties agree that if inmates are not *at* the library on time, they will be sent back to their housing unit. Moreover, once they arrive at the library, it is agreed that inmates must sign in before beginning their library activities or removing jackets.

The law library is intended to serve as a place of quiet legal research and study; pursuant to that aim, talking, visiting and loitering are prohibited. Any inmate engaging in disruptive behavior or talking loudly is subject to discipline and/or dismissal.

The library also offers a variety of services to inmates, including photocopy services. Inmates may drop off personal and legal materials for photocopying on a regular visit during posted hours or during the break between periods. Personal photocopying is screened for appropriateness. The parties agree that generally, library staff do not read the legal materials inmates submit, but Shaw contends that he personally witnessed Metzen reading his legal materials with regard to the incident between them, which is discussed further below. Apparently, the rules also disallow photocopying of materials that contain incorrect dates, names, case numbers or other information "in conflict with rules of the DOC," although Shaw contends that over the course of his seventeen years at OSCI, he has never before had legal documents rejected on the grounds that they included incorrect dates, names or numbers. Shaw also contends that except for the incidents described in this

3

lawsuit, he has never before had materials confiscated when he attempted to photocopy them.

### III. Offender Complaint No. OSCI-2011-10284

On May 26, 2011, Shaw filed Offender Complaint No. OSCI-2011-10284, complaining that he was "being hassled" by correctional officers and defendant Metzen for supposedly signing out too early or arriving too late to enter the law library timely. (*See* Def.'s Reply DPFOF (dkt. #42) ¶ 4.) The Institution Complaint Examiner ("ICE") who handled the complaint neither contacted Metzen nor informed her of this filing; in fact, Metzen had no knowledge of OSCI-2011-10284 until Shaw filed this lawsuit.

### IV. Verbal Complaints About Metzen

Sometime in October or November, 2011, Shaw also alleges that Metzen performed some "inferior photocopy work" for him. (*See* Decl. of Sheri Fromolz Ex. 111 (dkt. #33-9), at 6.)[2] Shaw reports that he returned to the library after supper and showed the purportedly inferior copies to Chaney, who redid the work. The next day, however, Shaw claims that Metzen confronted him, falsely accusing him of "forcing Ms. Chaney into redoing the photocopies." (*Id.*) When Shaw tried to explain that he'd needed the copies that night, he claims that Metzen called a "white shirt," whom Shaw identifies as a "Lieutenant Goo" or "Gou," and that they all then went into a private room where Metzen then "hovered over [them] with her hands on her hips and her voice raised," asking

---

[2] Ordinarily, Shaw could not rely on an unsworn letter to combat a motion for summary judgment, but in his declaration, he swears under penalty of perjury that "[a]ll the statements contained in the letter are true and correct." (Decl. of Terrance J. Shaw (dkt. #41) ¶ 3.) To the extent that Shaw could testify to the statements in the letter, then, the court considers them as potentially admissible evidence for purposes of summary judgment.

4

Lieutenant Goo to "put [Shaw] in the hole" or authorize a conduct report against him. (*Id.*) After Shaw then explained his side of the story, however, he claims that Lieutenant Goo determined Shaw had done nothing to warrant a conduct report. (*Id.*)

Soon after this incident, Shaw avers, Metzen "began to exhibit extreme animus" toward him. (Decl. of Terrance J. Shaw (dkt. #41) ¶ 7.) Specifically, she supposedly began to require Shaw to return to the W-Building, saying that he had arrived a few minutes too early or too late to use the library, although as Metzen points out, it is undisputed that she had already been enforcing those same rules as early as May, 2011. (*Id.* ¶ 8.)

### V.     January 9, 2012 Sign-Out Incident and Conduct Report

Metzen received a call from Correctional Officer Klick in the Movement Officer Station ("MOS") on January 9, 2012, advising that Klick had sent back a number of inmates who had signed out early from W-Building. Klick also told Metzen that other inmates who had signed out early might be coming toward the library. Thus, when Shaw entered the library, Metzen asked him what time he had signed out from the W-Building. Shaw responded that he signed out on time.

Metzen then called and spoke to the officer at the center, Officer O'Connor. O'Connor said that Shaw had signed out at 1:27 p.m. According to O'Connor, this was three minutes too early. O'Connor then instructed Metzen to send Shaw back to the W-Building Center. Metzen complied, directing Shaw to return to his center based on O'Connor's order. Metzen had no authority to override O'Connor's directive.

Metzen contends that Shaw then became angry and threatened to file an inmate complaint, although Shaw denies doing either. When Shaw went to stand near his coat and

folder, Metzen also noticed for the first time that Shaw had not signed in, although he was supposed to sign in before doing anything else. Shaw also stated that he could not make it to the library in ten minutes, because he takes nitroglycerin pills. By this point, it was 1:38 p.m. Metzen again told Shaw to return to his unit. It appears to be undisputed that he did so, although the parties again dispute whether he continued to complain loudly as he left.

On January 10, 2012, Metzen completed and filed Conduct Report #2176219 against Shaw for purported violations of Wis. Admin. Code § DOC 303.24 (disobeying orders), § DOC 303.28 (disruptive conduct) and § DOC 303.63 (violation of institution policies and procedures).[3] Metzen included a copy of the sign-in sheet, as well as the August 23, 2011, memo with the ten-minute sign-out rule. Metzen contends that she wrote the conduct report due to a genuine belief that Shaw had violated institutional rules, as Wis. Admin. Code § DOC 303.66 obliged her to do if she believed a rule violation had occurred.

In contrast, Shaw contends that Metzen wrote the conduct report to retaliate against him -- not for filing his offender complaint OSCI 2011-10284, but for the verbal complaints he purportedly made to Librarian Chaney and another correctional officer about Metzen's performance. Metzen did not personally participate in the disposition of the conduct report and had no authority over the hearing officers and adjustment committee. Ultimately, Shaw notes, he was found not guilty of violating institutional procedures, based on the

---

[3] It is a violation of Wis. Admin. Code § DOC 303.24 for an inmate to disobey a verbal directive or order from any staff member; it is a violation of Wis. Admin. Code § DOC 303.28 for an inmate to engage in disruptive conduct, including loud or offensive behavior; and it is a violation of Wis. Admin. Code § DOC 303.63 for an inmate to violate the institution's specific substantive disciplinary policies and procedures.

hearing officer's conclusion that "[t]here is a discrepancy between unit handbook and memo, as well as among unit staff." (Decl. of Kimberly Metzen Ex. 101 (dkt. #32-1), at 3.)

### VI. Offender Complaint OSCI 2012-879

On January 11, 2012, Shaw filed Offender Complaint No. OSCI 2012-879, seeking clarification on when W-Building inmates can sign out to attend the library as a result of the January 9 incident. As with Shaw's previous complaint, the ICE investigating OSCI 2012-879 did not inform Metzen of the complaint when Shaw filed it or during the course of the investigation. According to Metzen, she again had no knowledge of the complaint until after Shaw filed the present lawsuit. Unlike the first complaint, however, Shaw contends that Metzen did learn of the complaint at some point before this lawsuit, based on the fact that Chaney later discovered copies of Shaw's old legal documents in her desk -- presumably including this complaint -- and gave them to Shaw. (*See* Case No. 12-cv-497, Supp. Compl. (dkt. #6) ¶¶ 41-42.) From the record, it remains unclear when exactly Shaw contends that Metzen would have known about this complaint.

### VII. January 12 and 13 Refusal to Make Copies and Offender Complaints OSCI 2012-1272 & 7645

On January 12, 2012, Shaw submitted a request to have photocopies of yet another Offender Complaint (DOC-400) made. Before copying the document, Metzen noticed that Shaw had provided the wrong date on the form, dating it a week later. Metzen contacted the Program Director to ask for clarification as to whether the document was appropriate for photocopying. Due to the incorrect date, Metzen ultimately denied the request and returned the documents to Shaw. Metzen contends that she regularly enforced this rule to prevent inmates from lying in violation of Wis. Admin. Code § DOC 303.31, although

7

Shaw argues that he had never before had a document rejected for photocopying based on the inclusion of an incorrect date.

On January 13, Shaw returned to the library and again requested photocopies of the DOC-400 form. This time, Metzen noticed that Shaw had whited out the incorrect date and written in the correct one. Not having encountered this situation before, Metzen contacted security supervisor Captain Meitzen to ask whether the white-out conformed to prison policy. Apparently, Captain Meitzen informed Metzen that the document was not appropriate, a message she passed on to Shaw while denying his second request for photocopies.

That same day, Shaw submitted Offender Complaint OSCI 2012-1272, complaining that Metzen had refused to photocopy his DOC-400 even though he had corrected the typographical error. As part of his investigation, ICE Timothy Pierce contacted Metzen, who explained that: (1) she had denied the request on January 12 due to the incorrect date; and (2) she had denied the request on January 13 due to the use of white-out, as per the guidance she had received from the Security Supervisor. In his recommendation for OSCI 2012-1272, Pierce ultimately stated:

> I have discussed this with the complainant and Ms. Metzen. The complainant originally submitted a DOC-400 [to] Ms. Metzen to be copied. This is an offender complaint form. The complainant had the wrong date on the form. The date he listed was a week later. It was denied and this office would support this. However, the next day the complainant brought the same offender complaint to the library and he whited out the date and put the correct date in the box. Library staff still would not photo copy it for him. Ms. Metzen informed me a security supervisor told her not to. This office does disagree with this decision. As the correct date was on the form, there is no reason it could not be photo copied. No further action is needed by this office.

Warden Judy Smith accepted Pierce's recommendation on January 17.

### VIII. April 9, 2012, Confiscation of Legal Materials and Offender Complaint 2012-7527

On April 9, 2012, Shaw came to the library and asked to get photocopies of documents. Per policy, Metzen reviewed these documents for appropriateness before copying them and questioned whether there might be some issue regarding them, although she no longer recalls her specific concerns. (*See* Decl. of Kimberly Metzen (dkt. #32) ¶ 64.) According to Metzen, it was her practice in those circumstances to contact her supervisor, Education Director David Hines, for advice on copying. If Hines was not available, she generally contacted Program Director Thomas Pollard. Shaw purports to dispute this fact, arguing that Metzen had been employed at OSCI as a Library Assistant since 2002 and would "know herself" if documents were inappropriate (Pl.'s Add'l PFOF (dkt. #40) ¶ 13), but Shaw's unsupported speculation as to what Metzen *should* know does not undermine her sworn testimony regarding her regular practice.

Metzen ultimately did contact Pollard regarding her concerns with Shaw's documents, and Pollard directed that the documents be held for review by Hines. Metzen had no role in that decision, and she had no authority to override Pollard's decision. Consistent with Pollard's direction, Metzen confiscated Shaw's documents and provided them to Hines for review. Pollard himself then contacted Shaw and told him of the decision to hold the documents pending Hines's assessment.

That same day, Shaw submitted Offender Complaint OSCI 2012-7527, complaining that Pollard had confiscated his legal materials. On April 12, ICE Pierce recommended that the complaint be dismissed, noting:

> The materials were held pending review. Per Policy, ALL materials are reviewed prior to being copied. This does not mean they are read. They were given to Mr. Pollard for review. Mr. Pollard explained to the complainant why the materials were going to be held until the next morning as he wanted Mr. Hines to review them as he oversees this area. Staff can at any point confiscate any property that is in the complainant['] s possession. In this case the materials in question were given to the complainant the following morning. As such, no further action is needed by this office as no violation of the Administrative Code has occurred.

Warden Smith accepted this recommendation and dismissed the complaint on April 13. The parties agree that Shaw received his materials back following Hines' review and just one day after their confiscation. (Def.'s Resp. Pl.'s Add'l PFOF (dkt. #43) ¶ 14.)

Shaw also submitted Offender Complaint OSCI 2012-7645, dated April 10, complaining that "both librarians" were reading and laughing at his complaint materials, which he had turned in for photocopying. Metzen declared that at no time did she ever laugh at, or make fun of, Shaw's legal materials[4] (Decl. of Kimberly Metzen (dkt. #32) ¶ 73), but Shaw responds that he personally observed Metzen and "the other Librarian, reading [his] legal documents and laughing it up." (Case No. 12-cv-497, Supp. Compl. (dkt. #6) ¶ 27.) Still, he fails to provide further detail as to what, if anything, he heard or saw that led him to believe that the conversation was making a mockery of the contents of his legal materials.

---

[4] Metzen also declares that she does not read inmates' legal materials, but that she *does* "scan" them for appropriateness. The court is uncertain as to the distinction. For example, without further explanation, the court is not persuaded that merely "scanning" the documents for appropriateness would mean that Metzen would be unaware of the contents.

10

### IX. August 28, 2012, Photocopying Incident

Around August 28, 2012, Shaw came to the library and requested photocopies of the 42 U.S.C. § 1983 complaint he filed in this lawsuit. After reviewing the documents, Metzen approved the request and made the copies, providing them to Shaw on the same day. According to Metzen, she discovered after Shaw had left that she had inadvertently left the originals in the copy machine; Shaw contends that *he* discovered the documents were missing and contacted W-Building Sergeant Peterson, who then called Metzen. Regardless, Metzen at some point spoke to Sergeant Peterson and informed him that Metzen had left Shaw's original complaint on the copy machine and that he could return to the library that day to get it. Shaw did not return to the library that day, however, and so Metzen put the document next to her computer until Shaw could return for it, choosing that spot because she believed the document would be easy to find.

Metzen was not working the next day when Shaw returned to the library requesting his original document, although Chaney was. Unaware of the missing paperwork at that time, Chaney looked through the "completed copies" box, which is routinely used to hold inmate copies and forgotten paperwork, to see if anything belonged to Shaw. Finding nothing in that box, Chaney looked around Metzen's workspace, where she located paperwork for Shaw.[5] It was not, however, the paperwork that Shaw had claimed was missing. Shaw asked if Chaney had located any additional paperwork, and Chaney responded that she had given Shaw what she found. Metzen declares that the next day, she personally returned the document in question and apologized; Shaw, on the other hand,

---

[5] Apparently, Chaney thought to check Metzen's workspace because Metzen and Chaney routinely had to work in the library alone, and it was not uncommon for them to become overwhelmed with copies during a busy library period and accidentally misplace paperwork. Shaw does not dispute this general statement. (Pl.'s Resp. DPFOF (dkt. #39) ¶ 84.)

11

maintains that he never received the original back. (*See* Pl.'s Resp. DPFOF (dkt. #39) ¶ 87.)

Metzen maintains that it was not her intention to withhold documents from Shaw and that during her time at the OSCI library, she made every effort to avoid mishandling documents. Shaw, of course, disputes this, contending that Metzen intended to retaliate against him by keeping his legal papers, although he agrees that between January and August of 2012, Metzen photocopied "countless" documents for him without incident. (Pl.'s Resp. DPFOF (dkt. #39) ¶ 90.)

OPINION

To prevail on a claim of First Amendment retaliation, Shaw must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor (that is, a "sufficient condition") in Metzen's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *see also Greene v. Doruff*, 680 F.3d 975, 979 (7th Cir. 2011). If Shaw satisfies that requirement, Metzen may rebut the prima facie showing by "showing that [her] conduct was not a necessary condition of the harm -- the harm would have occurred anyway." *Greene*, 680 F.3d at 980.

Shaw complains of several different, allegedly retaliatory acts on Metzen's part. One of them -- involving the conduct report Shaw received on January 10, 2012 -- is problematic from the outset because of the timing. There is no evidence that Metzen even knew Shaw had filed any inmate grievances against her by that time. The only grievance in this record

that predates Shaw's conduct report was the May 26, 2011, offender complaint, but it is undisputed that Metzen knew nothing of this grievance until Shaw filed the present lawsuit, months after Metzen filed the January 9, 2012, conduct report. *See Morfin v. City of E. Chi.*, 349 F.3d 989, 1005 ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.") (internal quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 1000-01 (7th Cir. 1999)).

Perhaps recognizing this obvious flaw, Shaw changes his focus in his brief in opposition, arguing that Metzen was aware that he had complained about her inadequate photocopying performance to Chaney in November or December of 2011, which predates her conduct report. (Pl.'s Br. Opp'n (dkt. #38), at 2.) The problem with this new theory is that Shaw neither pled it in his complaint nor in the supplement that followed (*see* Case No. 12-cv-497, Supp. Compl. (dkt. #6)). "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)). Shaw's allegations that Metzen issued him a conduct report in retaliation for "filing prior complaints against her" did not give her fair notice that his retaliation claim no longer rested on the formal, written offender complaints he filed against her that had been the focus of his complaint, but rather on verbal complaints Shaw made about inferior photocopy quality in November or December of 2011. *See, e.g.*, *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1314 n.11 (7th Cir. 1987) (upholding district court's rejection of a claim where "complaint did not give fair warning of the theory"). Even if it had, it is also questionable whether Metzen's display of "animosity" and continuing to enforce punctuality rules in

13

retaliation for verbal complaints to Metzen's co-worker about the quality of her photocopying is deserving of First Amendment protection. *Cf. Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010) (a supervising librarian's conduct report in response to inmate's confrontational complaints was not protected speech). Accordingly, Metzen is entitled to summary judgment on any claim that the January 10, 2012, conduct report was retaliatory.

The next "retaliation" Shaw challenges is Metzen's refusal to make his requested copies on January 12 and 13. Shaw claims that this refusal was part of "a continuing course of Retaliation stemming from the prior Complaints Shaw made of Metzen's inadequate Job Performance." (Pl.'s Br. Opp'n (dkt. #38), at 3.) For the reasons stated above, this is not a viable theory, as Shaw did not raise it in his complaint. Shaw also does not argue that his *other* protected conduct could support this retaliation claim. In any event, the only evidence of record is again that Metzen still did not know of the May 2011 grievance on January 12 and 13, nor that she then knew of his January 11, 2012, grievance. Shaw does not aver, for example, that he presented the grievance to Metzen for copying on January 10 or 11 before filing it with the Inmate Complaint Review System ("ICRS"). Instead, he argues that Metzen had a copy of the January 11 offender complaint in her desk as of *August of 2012*, which of course says little, if anything, about what she knew on January 12. Absent evidence, it would be sheer speculation to conclude that Metzen knew about the January 11 conduct report when she refused to make Anderson's photocopies at the direction of her supervisor on January 12 and 13. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."). Even if there were, Shaw is unable to get over the other

evidentiary hurdle: that Metzen acted at her supervisor's direction. Accordingly, this claim fails as a matter of law as well.

Next, Shaw complains of the April 10, 2012, confiscation of his legal materials. By this time, Metzen did know about Shaw's OSCI 2012-1272 complaint against her, which Shaw had filed on January 13 and Examiner Pierce had contacted her about within the following few days. But this claim fails for a different reason: Shaw has presented *no* evidence of a causal connection between the January 13, 2012, grievance and Metzen's one-day confiscation of his documents to be screened for appropriateness almost three months later. Admittedly, Metzen no longer remembers her reasons for withholding those documents, which makes it difficult to assess their legitimacy, but at minimum, another supervisor, Program Director Pollard, not only approved but insisted that the documents could not be released until Education Director Hines examined them personally. While Shaw attempts to explain this away -- arguing that Metzen obviously "calls [her supervisors] up and tells them her false allegations about [Shaw] and [his] legal documents" (Pl.'s Reply Pl.'s Add'l PFOF (dkt. #52) ¶ 14), for which she can hardly be exonerated -- he cites *no* evidence in support of his version of events, nor can the court discern any reason why Shaw would have personal knowledge to testify to these accusations.

Finally, even if the court were to assume that Metzen's reasons for withholding documents were utterly baseless (Pollard's subsequent actions notwithstanding), there is still nothing in the record that links this April 10 "confiscation" to Shaw's January 13 grievance. Not every unfair action gives rise to a claim of retaliation; the unfair action must be *motivated by the protected conduct*, *Bridges,* 557 F.3d at 546, and there must be evidence in the record to support that inference at summary judgment. Shaw's implicit argument that

15

Metzen had his January 13 grievance in mind when she declined to photocopy his legal materials on April 10, almost three months later, is nothing more than speculation. Without more, no dispute of fact is sufficient to overcome defendant's motion for summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (plaintiffs' "collective hunch about the defendant's motives" alone "will not survive a motion for summary judgment"); *McCormack v. Hamblin*, No. 12-cv-535-bbc, 2014 WL 988769, at *7 (W.D. Wis. Mar. 13, 2014) (granting defendant summary judgment on retaliation claim where plaintiff had "nothing more than speculation" to support his theory; three-month gap did not demonstrate suspicious timing); *cf. Greene*, 660 F.3d at 980 (triable issue on retaliation claim where defendant learned about protected activity one day before he filed a "rather threadbare" conduct report against the plaintiff).

      Shaw has, therefore, failed to meet his initial burden to produce evidence from which a trier of fact can infer his January 13 First Amendment-protected grievance was at least a motivating factor in Metzen's decision to confiscate his documents for review.  The court also has doubts as to whether a one-day delay in the provision of photocopies would rise to the level of conduct sufficient to deter a reasonable person from future First Amendment conduct, but it need not reach that question definitively. *See, e.g., Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (noting that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise").

      Finally, Shaw would maintain his claim based on Metzen's alleged August 28 failure to return his § 1983 complaint after he submitted it for photocopying.  By August 28, Metzen knew of the January 13 grievance; viewing the record in the light most favorable to

16

Shaw, she also knew of the January 11 grievance, since according to Shaw, Chaney discovered a copy in Metzen's workspace the next day. It is also undisputed that Metzen did not return Shaw's original documents to him after she photocopied them on his behalf on August 28, at least not initially. But Shaw has pointed to *no* evidence putting into dispute Metzen's explanation that she forgot she had the original in her possession; in fact, Shaw concedes that it was not uncommon for Metzen or Chaney to misplace paperwork inadvertently during a busy library period. Shaw also does not dispute Metzen's statement that upon receiving a call from Sergeant Peterson, she placed the original § 1983 complaint next to her computer so that it would be easy to find. While Shaw does argue that he never *actually* received his original litigation papers back, notwithstanding Metzen's placement of that document beside her computer, at best, that only permits the inference that Metzen took no great pains to ensure Shaw received his original document back. As above, nothing about this record allows for a reasonable inference that Metzen's alleged refusal to return the original complaint was motivated by Shaw's earlier grievances against her.

Shaw also argues that Metzen's secret retention of copies of *other* legal documents supports his claim of retaliation, but he again fails to explain how that fact, even if true, supports Shaw's theory of a causal connection between his January grievances and Metzen's retention of the § 1983 complaint in August, particularly given the length of time that had passed. Shaw also argues that this was simply one more in a long line of retaliatory actions on Metzen's part, creating a sort of continuing "pattern" of harassment for his First Amendment activities.

As previously discussed above, Shaw has not demonstrated that *any* of Metzen's actions were *in fact* retaliatory, so he cannot prevail on this theory. *Cf. Bridges*, 557 F.3d at

17

552 (at screening, prisoner stated a claim for retaliation based on continued pattern of harassment in a variety of ways over several months). Nor has Shaw ever contended that the retention of the § 1983 complaint was retaliation for some other protected conduct. And, once again, the court doubts that the conduct itself -- the failure to return an original document, when photocopies have already been provided -- rises to the level of conduct that would be likely to deter a reasonable inmate from exercising his First Amendment rights in the future.

In the end, Shaw has produced little in the way of admissible evidence to support his retaliation claims. Some of the purported retaliation occurred before Metzen knew about the protected conduct on which he premised this lawsuit; for the rest, he has presented no evidence sufficient to show that his protected conduct was a motivating factor in Metzen's actions. Shaw may well feel he was treated unfairly, but the First Amendment does not provide a remedy for any and all unfair treatment. *See Lehn v. Bryant*, No. 04-CV-3100, 2007 WL 1099531, at *3 (C.D. Ill. Apr. 10, 2007) (granting summary judgment to defendant on a retaliation claim where treatment "may be unfair and unnecessary" but there was "no reasonable inference that [defendant's] actions were motivated by retaliation"). And nothing in this record -- not the timing of events, and not other, independent evidence of animus -- would permit a reasonable trier of fact to find that Shaw's grievances motivated Metzen's conduct.[6] Accordingly, Metzen is entitled to summary judgment, and her motion will be granted in its entirety.

---

[6] Even if Shaw had submitted such evidence, Metzen's actions do not constitute a clear violation of Shaw's constitutional rights, in which case Metzen would be entitled to qualified immunity.

ORDER

IT IS ORDERED that:

1) Defendant Kimberly Metzen's motion for summary judgment (dkt. #29) is GRANTED.

2) Defendant Terrance J. Shaw's motions for extensions of time (dkt. ##46, 51) are GRANTED, making his Reply in Support of Proposed Findings of Fact timely filed.

3) The clerk of court is directed to enter judgment and close this case.

Entered this 1st day of September, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge